Good morning and welcome to the House Circuit. We are pleased to have Judge John Antune of the Middle District of Florida sitting with us today. We will as usual have the petitioner or appellant reserve time but we will not watch your time for you. We will begin with the first case on the calendar Wu v. Merrick Garland. May it please the court. Thomas John Trigger for the petitioner. Mr. Wu. The case is based on inconsistencies and credibility. The first one that the judge had read into the record that she felt was so strong and it was damning was that he wrote in his statement that evening was Christmas Eve. I will never however petition as she states the judge however the petitioner forgot and didn't recall that it was Christmas Eve. During the whole testimony whether it be the direct cross or by the immigration judge he was never given an opportunity to explain what this inconsistency if there is an inconsistency at all this is required on the sestra. On the sestra he's supposed to have that ability and that opportunity to explain it. He said it was December 24th which is and he also said it was silent night which in China is Christmas Eve so. Agreed. That one doesn't work very well. I agree I agree with you and and right agreed and if you look at how the judge is approaching that paragraph she only takes the last two lines as opposed to the whole context of that paragraph which his experiences that he shared and that's what moved him and that's what he really recalls. The only adverse credibility finding. Could you move to the others? Yes of course the second one being the actually he forgot the name of the church on page 93 of the record. You're doing a very good job of finding the things that were said that didn't make sense because the name of the church was the church of St. Gabriel so it didn't have a name it was the church of St. Gabriel. Exactly. So here are the two things that I think may be insuperable that I want you to talk about. One of them is the demeanor finding which is always very difficult to review and the second is the his account of the beating of the actual incident. Right so under the demeanor she never actually in her decision she never specifically states what part of the record she's referring to so there's no specific direction of why she is she's using this demeanor finding so there's not a specific instance at all I mean you read it in the record where he's covering his hand but in her decision she doesn't address it so we don't know I can't really go into any detail of saying why that would be making less credible without a specific finding. Read it and see there are places where he's asked a question and he either answers with something that doesn't seem connected to the question or he doesn't answer. Well one of the issues he puts his mouth over his hand over his mouth when he's actually recalling the silent night and he's trying to figure out the verse I don't know if he's trying to sing into his hand and figure out the verse but we don't know but she doesn't state technically in her decision what she's referring to. The record reflects those points and we can look to the record and then look to the decision and then put those together why would she have to state that if we can discern it from the record. The reason why is because she's using other basis is to deny the case specifically and then with the demeanor she's not so we don't know what which one she's referring to. But yes we do if we look at the transcript. Agreed but it's not you're not in the decision she's not delineating why he would not be credible based on that. And also how would we know that's the one she's using you know and that essence. So unless there's a specific she says. But here for example we're on page 57 and he says well on silent night is just to commemorate Jesus commemorate Jesus of that I'm sorry commemorate Jesus of what sir that I don't know I forgot from the verse I forgot. Then the respondent has put his hands into his mouth mumbling so you don't know what silent night is. And so he doesn't answer that question. How would that affect his credibility. In all honesty the question was what day did you go what was the first day you went to the home church. The question was on silent night is to commemorate Jesus commemorate Jesus of that commemorate Jesus of what I don't know I forgot. And then what and if you go further on he does explain what it means that it means peace and to commemorate Jesus and we give apples. Well the problem with that is that he does explain what that what the meaning of silent night is. The problem I see in that is he makes an issue of his faith as being the reason that he was persecuted and came here. And then he doesn't really ever articulate what is meant by silent night or Christmas Eve. Except to commemorate. But you know it means more than that. And then when he's asked when he when he's asked to name his favorite book in the Bible he fails to come up with an answer. Isn't that significant. It would only be significant if the person is saying he knows nothing about the actual Bible. He does mention that he's Noah and the Ark but he never was given an opportunity to explain what he knew about Noah and the Ark. Each person has their own preference of what they like to read in the Bible. So when the when the actual government attorney asks him about which book. I mean that made that's based on what her knowledge of what she wanted him to know of Christianity. Which is unfair to the client as opposed to why don't you just ask him what's your favorite part of the Bible. Please recite it. And why. And some of the inquiries about Christianity went a little far like Jesus died in the cross. Why did Christians need baptism. Right. No. And I suspect many people don't know. So getting on to. I was concerned also to me the one place where he definitely had different stories was about the actual beating. Right. Correct. So let's address the I guess the elephant in the room so to speak which is basically he says he was punched and kicked. And then he explains that this is the way he describes beating and that he didn't know how to express himself. But it wasn't only that. He said in his application that it went on for a long time. And he said when he testified that it happened sort of instantaneously just once when they hit him with his electric baton. Correct. But the petitioner you know he said basically at this point in his written statement that he used the word torture. And that could be used for what was the electric baton situation. Except that he said it went on for a long time. Fine. Which here's the key you know that we don't know how many times he was slapped. We don't know how many times. Well he did say he said a few times. That's my recollection. Right. And then he said. Right. Let's see. He used his right hand to. No that's before that. I'm not finding it now. But I thought he said a couple times and he used the electric baton just once. Oh I was slapped in my face several strikes. That's what he said. Right. Correct. And then he was also questioned and we don't know how long the questioning with the slaps how long that took. So you know this is an omission. And you know quoting lies. It's not an omission. It's a contradiction. Oh. Well he never wrote it in his statement. But what he wrote in his statement was that he was beaten and punched for a long time. Right. But in under Cessna you have to look at the totality of circumstances in order to find credibility. And omissions is one of the least fact finding ways to find someone not to be credible under Lie, under Singh, under Bhandari, under Lopez. But this is. So if you look at. Here he was specific on one occasion about how he was tortured or abused. And then comes up with a different version including a very specific and extraordinary kind of harm. Isn't that different? It is different. But here's the thing about if you look at the law under Cessna. Under Cessna you have to take the totality of the circumstances. And here the judge did not actually consider other evidence that's in the record that corroborates what he testified to. So as far as the medical records. So the medical records on page 198. Why did the judge consider that? Where it says that he had wrist wounds and clavicle injuries. Which comports with what he testified to. Why did the judge even consider that factor in order to look at the totality of circumstances? It comports with one version but not the other. Well he didn't actually testify to the other. He wrote it down. But then he explains why he didn't testify to it. He says that's how I generally describe what the definition of beating is. Now if you look at this petitioner. He only has a high school graduate degree. And he says he's not an excellent student. And he didn't go to an excellent school. He went to a poor school. So this is the issues that when you look at each petitioner you have to take them at their ability and their intelligence. He also said in his application that they handcuffed my two arms back to an iron chair. When he testified he didn't say that either. Well he said his handcuffs were behind him. Yes but he didn't say anything about being handcuffed to a chair. I mean here's the point. There are inconsistencies. But when you're balancing the injury and the supportive documents. It is consistent. He does have the injuries to his wrist that are stated in the medical records on 198. He does have the actual injury to the clavicle which he testifies to. You know if we look at every little detail and have someone recall from so many years ago. Is that something that if we didn't have corroborative evidence. Yes I would say you're right. But in this instance he does have two pieces of evidence that corroborate what happened to him. The second one being on 226. Which is the actual letter he got from his other church member that says. They were having a family church gathering on December 24, 2009. We were arrested by the police when we had a gathering on June 4, 2010. They were arrested again earlier in earlier time. So again it supports exactly what happened. If there was no corroborative evidence I agree. These are inconsistencies that cannot be negated. But under the totality of circumstances an immigration judge is not given a blanket check. To cherry pick certain factors to insulate a negative credibility finding. Knowing that if you look at this client. He's not highly educated. And matter of fact he was going to go to hairdressing school. Because he had no other opportunities. And then he couldn't even do that because the tuition was too high. So in the totality of the circumstances. If you're looking at it the first three issues that the judge raises are not really inconsistencies. So it's really demeanor. And then this being where he's describing his harm. Which he then corroborates. So you're now over your time. So thank you very much. Thank you. And we will hear from Mr. Shuchard. Good morning your honors. Thank you very much. May it please the court. I'm Spencer Shuchard for the Attorney General. In this case the agency denied all of the petitioner's claims. Because under the totality of the circumstances it didn't believe him. It gave us two main reasons for that. Number one, his demeanor in context. Well, the IJ at least didn't give two main reasons. She gave a bunch of reasons. Several of which make no sense at all. And the question is, you know, especially after our Olem decision, what do you do with that? I mean this thing about the date made no sense at all. He, his statement that he was under stress from his family and so on was implausible. And that didn't make any sense. Because he explained that he was feeling responsible for his family. And that he was looking for a job. And he was trying to decide whether to go to school. And so that didn't hold up at all. And it didn't hold up in a way, this is what troubles me. That the vehemence with which this was said. Like the way in which he made fun of this Christmas Eve thing. When he was perfectly consistent about the date. Just sort of gives you great pause about whether this person who was making the decision was looking at the situation fairly. Now there are, you know, there is a demeanor thing. And there is this, the material about the meeting. And the question is do we say that this was overall a fair determination. Or that given the fact that at least large chunks of it were not. The most damning inconsistency was that he says he first attended a church meeting on Christmas Eve. And he never forgot it, but he did forget it. And he was able to recall that he said it was on Christmas Eve. But he did say it was December 24th and described it as a silent night. I don't know what that means. I mean he had a good say. He never, he said exactly the right thing. I don't think that he did, Your Honor. The point of that I think was that he said it's Christmas Eve, but he can't remember what it is. And he can't remember what it commemorates. He calls it silent night. Which as far as I could find doesn't appear anywhere else in the record. So it's fair to ask him about it. It doesn't appear in the record, but it is the word in China for Christmas Eve. It is what Christmas Eve is called in China. That's not in the record. But it's true. And maybe that wasn't evidence to the idea. Yeah, but it should be true. Fair enough, Your Honor. But at any rate, that can't be inconsistent. Christmas Eve is silent night. It's not wrong. According, the petitioner, if it's not wrong, why couldn't the petitioner say it is the point. And this isn't the only finding, Your Honor. Judge Berzon, you mentioned Alam. If Alam tells us anything, it's that we're not here to do adverse credibility arithmetic. We're not just knocking out this one and this one and saying there's only a couple left and that's not enough. We're always going to be doing. I understand that. I'm trying to be a little more thoughtful about it, which is to say, is there a point at which you think that some of the IJ's conclusions are just so far off that you question the, I don't know if the good faith is exactly, you know, just the judgment, the sense of judgment seems off. Now, this one, the two other things may be strong enough that we don't worry about that. But it's troubling. It's not just the – The church, he says he attends in the United States. And then you look at the piece of paper about the church and the name of the church is the Church in San Gabriel. That's what he said. It was the Church in San Gabriel. It doesn't actually have a name. It has a name. It has a proper name. It's, you know, title case, the Church in San Gabriel. He never said that. If somebody tells you the name of this church is the Church in San Gabriel and you ask the name of it, you say, well, it doesn't really have a name. It's the Church in San Gabriel. That's pretty accurate. Either way, Your Honor, the Board didn't address that ground, so it's not properly before us here. That was the ground, the stuff about the name of his church, about why he became a Christian, you know, the pressures that he felt, none of that stuff the Board ever affirmed. The only thing that the Board talked about were the silent night finding, the major inconsistencies about the beating, which is the foundation of his claim, and then his strange demeanor. And all of that stuff, as Your Honors have said, regardless, well, perhaps we'll quibble about the silent night, but those are legitimate, and they're enough to sink his claim, more than enough. I mean, if you look at the demeanor, I mean, remember, we're here under the totality of the circumstances. The IJ here is due an extraordinary amount of deference because out of all the judges and Board members who have had eyeballs on this case, she was the only one who was there in the room watching him try to reconcile the things that he was saying with the things that he had said, and she was the one who was tasked with reconciling his actual behavior with his expected behavior. Ask a man some questions, questions with easy enough answers. What is silent night? It's his words he couldn't answer. What were you reading when the police came knocking at your door? He sticks his fingers in his mouth. He mutters to himself. Eventually, he says his story about a lost lamb. Again, how long have you been attending church in the United States? He pauses, long pauses. He covers his hands with his mouth. It's two years. These aren't difficult questions. He struggled to answer them, and at times, as she said, he couldn't answer questions. He didn't answer them all. He's nonresponsive. He would answer questions that he hadn't been asked, or he would just answer in nonsense. Again, the silent night thing, he never did answer that question. The question was, so you don't know what silent night is, and the answer was, hmm, hmm. He's asked about when exactly did you tell your family? He doesn't answer that. He volunteers things about what Christianity means to him. And I'm actually going to let him speak for himself on this one. On page 122, the question is, why didn't you attend any established denomination churches? And the petitioner responded, that doesn't mean. It does not have. It did not have his name. Well, what we say, how can I put it? That is to say that a Christian entity that first founded for that church, the founder was Ni Tuo Sheng. Sorry I cannot put it in. I have the, that's indiscernible. Your Honors, there's no adjudicator in the world that's going to be compelled to call that a responsive answer. It's gibberish. This is a question, it's easy enough to say, I don't know. He didn't say that. He sort of rambles on on this. And I know the petitioner in his argument was claiming that you can't see these things from the record, but you can. And the board gave us citations for nonresponsive, 57, 60, 62. I'm citing the transcript numbers that they gave, but I've cited them for you in the administrative record. And they're reasonable. These are not responsive answers. There's plenty of evidence in the transcript here to find substantial evidence in support of what the IJ did. And as to the demeanor findings, keep in mind with the extraordinary deference that the IJ is due, all she has to do is describe the nonverbal conduct and contextualize it. And she did that. She says what happened. She places it in context of when it happens. It's accompanied by pauses. It's followed by nonresponsive answers. And talk about where it appears in the record. And she's done that. And under Jabril and Maine's v. Sessions, that's all she has to do. That's the deference that she's due. That's enough to sink this petitioner's claim. And the inconsistency about the beating is dramatic. It's not just a matter of, oh, I forgot to mention there was a baton involved, a shock baton. It's what the IJ characterized as the most egregious thing that happened to him. And I think that's a fair characterization. That's probably the most terrible thing that happened to him that day. It lasted for two seconds. He said it happened for a long time. He said he was punched and kicked. It turns out he wasn't any of those things. He was slapped. And his explanations are that he used words that were similar or mean similar things, but they don't. That explanation doesn't really make sense. If someone ran up to you and slapped you. You're probably right. However, one can't forget that he was speaking Chinese through a translator, was he not? He was. But, Your Honor, he hasn't complained about the translation. There are no complaints about interpretation here. These are his words. Whenever we start picking away at language and we know that we're not talking the same language, either in the application or at the hearing, there's an intermediary that's being disregarded. That's fair enough. We don't really know whether when he spoke to somebody, when he wrote his application, who wrote down, punched, whether the word that was actually used was different than the word that he used for slapped. Do we know that? Of course we don't. Your Honor, you and I, we've seen a lot of these. And, of course, we can think of a million reasons why this wouldn't match up. But the point is not to come up with some plausible reason why this couldn't be. No one has said that. But it just always disturbs me. Well, I mean, speaking of, you know, you characterized the IJ's description of Silent Night as making fun. And I think that's an unfair characterization. We don't want to put these things in the record that aren't there. He did, by the way, say exactly, why did you put it in your narrative statement? Because in China we also enjoy the Silent Night because in China we also call the stay as in Silent Night. So we did say it is in the record. This is something that I wanted to point out about that finding because the question is essentially saying, why did you put Silent Night in your statement? Which he didn't. It's actually not in the statement. The government attorney misspoke there. And the petitioner accepts the premise of that question that he had put it in there. He didn't. So that again. He didn't say he put it in his statement. He said he spoke when he testified he said it. So why did you put that in your narrative statement? Okay, he didn't. Yeah. So the question got it wrong, but the petitioner still didn't think of it. He's like, I don't know why I put it in my statement. Because, I mean, it's just another example of him not realizing what it is that he had said. This happens to him over and over. And this, again, is exactly what happened. His explanation. Because when he put it in the statement, he was speaking in Chinese, right? He was speaking in Chinese in court, Your Honor. Right. And so when he says, I put that down at silent night in writing in this statement, maybe that's what he said and we don't know. Somebody, one person wrote it down at silent night as Christmas Eve. Another person translated it as silent night. They are the same thing. He said it was the same thing. So it's really. The petitioner hasn't raised that possibility. But it's not worth arguing about because. Well, Your Honor, that's true. I understand your other points. Just getting down into the nitty-gritty on each individual finding is sort of like over-explaining the punchline to a joke, right? You're really taking a lot of sauce off the meatball here.  I don't know what that means. A lot of idioms.  I'm sorry. I was really proud of that one. I don't know about the sauce off the meatball idiom. That one I've never heard of. You're going a little low there, so let's just keep it legal. Well, sorry. My apologies. But the point is, we're under the totality of the circumstances. Set aside all my poor analogies. Indulge me, if you will, about 30 seconds with a hypo, if I may. You are out of time, so it's 30 seconds. 30 seconds, yes, Your Honor. A man comes up to you. He declares solemnly that on Christmas Eve 2009 he gave his soul to Jesus Christ. He began attending church daily or weekly, reading the Bible, until the police came and they punched him and they kicked him and they beat him and they tortured him for a long time and he'll never forget it. And then he gets on the stand and he forgets all of it. The punches and kicks become something else entirely. The long-time shock, the long-time torture becomes two seconds, one, two, of a shock. His explanation for this is that he used words that were equivalent, even though they aren't, and that he didn't really know what to say, even though this is what happened to him. And while he's doing this, he's pausing and sticking his fingers in his mouth and behaving strangely. Is that a person who you, as adjudicators, would feel compelled to believe he was telling the truth? No. Our position is no. Okay. All right. Thank you very much for your argument, spirited argument. And Mr. Tirigo, we'll give you one minute. Thank you. Thank you, Your Honor. Just to quickly sum up, he didn't put his hands over his mouth when he was testifying about how he was being harmed. He was clear. I did not get punched and kicked. I did get shocked by electric baton. He was dazed and confused from that. It affected his memory and his body. If you look at the totality of the circumstances, is this judge analyzing this case in a fair way under SESTRA and including and looking at all the evidence that's relevant? And in this case, we can say no. Counsel, was a due process claim raised before the agency? Before the agency? And if you're talking about the BIA? The BIA. Was a due process claim raised? The only way we can raise due process is under the case law SESTRA. And under SESTRA is the due process where it has a check and balance. That's not true, Counsel. Due process claims are raised all the time before the BIA. Correct, Your Honor. And I understand that. But in this instance. My question to you is, was a due process claim raised in the appeal to the BIA? I don't believe so, Your Honor, no, because it wasn't addressed. Okay. And you don't raise it in your brief either as a separate argument. So thank you very much. Thank you. The case of Wu v. Garland is submitted.
judges: BERZON, RAWLINSON, Antoon